# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| FREDERICK FULLER, THADDEUS EDWARDS, JARVIS SANDIFER, and of similarly situated individuals | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 4:20-cv-01027 |
| JUMPSTAR ENTERPRISES, LLC; TFORCE FINAL MILE LLC, BRIAN TYSON and KATHLEEN TYSON | § § § § | |
| Defendants. | § § | |

## DEFENDANT TFORCE LOGISTICS EAST, LLC'S MOTION
## FOR SUMMARY JUDGMENT AND INCORPORATED BRIEF IN SUPPORT

Kevin M. Duddlesten
Texas Bar No. 00793644
kduddlesten@mcguirewoods.com
DUDDLESTEN LAW GROUP, PLLC
PMB 325
4347 W. Northwest Hwy, Ste 130
Dallas, Texas 75220
(214) 315-3520 (Telephone)

***Attorneys for Defendant
TForce Logistics East, LLC***

424994.1

Defendant TForce Logistics East, LLC ("Defendant" or "TForce"), incorrectly identified as TForce Final Mile, LLC, files this motion for summary judgment requesting that the Court determine as a matter of law that Defendant was not the joint employer of Plaintiffs and, consequently, that Defendant is entitled to summary judgment in its favor on all claims pursuant to Federal Rule of Civil Procedure 56.

## NATURE AND STAGE OF PROCEEDING

This is a wage and hour matter in which the three Plaintiffs allege that they were improperly treated as independent contractors under the FLSA by Jumpstar Enterprises, LLC ("Jumpstar"), denying them overtime compensation. Plaintiffs have also asserted a number of state law wage claims, alleging that Jumpstar filed to pay them all amounts owing under the Texas Payday Act. Plaintiffs have asserted that TForce is liable as an ostensible "joint employer" because they provided delivery services to TForce customers under a master contractor agreement between TForce and Jumpstar. At the initial status conference on July 10, 2020, the Court identified the "joint employer" question as a threshold issue to be resolved and ordered the parties to conduct discovery and submit motions and briefs on the issue by September 18, 2020 (a date later extended to October 9, 2020). This is TForce's motion for summary judgment on the joint employer issue which, if granted, would effectively end the claims against TForce in this matter.

## SUMMARY OF ARGUMENT

Though Plaintiffs would have this Court believe that TForce and Jumpstar entered into some scheme to avoid paying Plaintiffs overtime wages, the reality is far simpler. This case

2

involves a straightforward commercial relationship between TForce and Jumpstar. Nothing in the contract between TForce and Jumpstar, or in their dealings, extends the relationship between Jumpstar and its drivers to include TForce. None of the Plaintiffs was ever treated as an employee by TForce and, contrary to Plaintiffs' self-serving conclusory testimony that they were "employed by TForce," the true indicators of an employment relationship under the FLSA (according to well-settled Fifth Circuit caselaw) do not exist here. TForce is a defendant in this lawsuit based on little more than the depth of its pockets.

Consider the analogy of a homeowner who contracts with a painting company to have her house painted, after which the homeowner pays the painting company (rather than the individual painters assigned to perform the work). During the project, the homeowner interacts with and provides instructions to the painters assigned, to ensure quality work in accordance with the contract. That interaction and instruction includes notifying the painters if they are using the wrong color paint or instructing them that they have not properly covered furniture with a drop cloth, or instructing them to paint rooms in a particular order. The painters ask the homeowner questions regarding project details from time to time, for example, whether particular trim or molding should be painted. The homeowner comments to the painters that they are doing nice work or, where appropriate, that the work is going more slowly than was anticipated. The homeowner may even determine that a particular individual painter is unsuitable (for example, after spilling a paint bucket) and notify that individual not to return or, alternatively, demand that the painting company remove that individual from the worksite. Yet, despite all of the interaction and instruction, no one could credibly contend that the homeowner was a joint employer and therefore responsible for overtime pay, in the event the individual painters decided to sue the painting company and the homeowner for unpaid overtime under the FLSA.

Yet that is the largely what is occurring in this lawsuit, at least regarding TForce. TForce contracted with Jumpstar for pick-up and delivery services in a designated area, in a remarkably similar way that a homeowner contracts with a painting company. TForce paid Jumpstar a contracted price for work and never paid any of the drivers, leaving the issues of when, how, and how much to pay the drivers entirely to Jumpstar. TForce instructed and required Jumpstar (and thereby the Plaintiffs) to account for custody and tracking of the items being delivered by scanning the items at pick-up, on delivery and, where necessary, upon return. On occasion, TForce notified Plaintiffs that their rate of successful deliveries was below expectations, or that they were doing a good job on those same expectations. There were no doubt numerous interactions between Plaintiffs and TForce throughout the day. And in the event a customer to whom Plaintiffs were delivering items complained about misconduct or requested that one of the Plaintiffs not handle their future deliveries, TForce would ask that Jumpstar remove them from that particular route (without terminating that Plaintiff's relationship with Jumpstar).

Despite all of this, none of the Plaintiffs in this lawsuit was an employee of TForce. Just as with homeowner contracting for painting service, TForce is entitled to monitor and instruct to ensure the delivery services for which they contracted are performed correctly and in accordance with end-customer basic requirements, without becoming a "joint employer" to conveniently satisfy a judgment against the primary target (Jumpstar). Just as there is no valid basis for an individual painter to pursue claims against the homeowner for wage and hour violations, there is no basis for Plaintiffs to pursue their claims against TForce here.

It is clear from controlling case law that the FLSA standard for joint employment was not intended to abrogate arm's length independent contractor relationships. While joint employment under the FLSA is designed to be defined expansively, its true purpose is to prevent employers from shielding themselves from responsibility for their employees and the actions of their agents.

4

As clearly shown below, Plaintiffs were not TForce's employees and Jumpstar was not its agent. Jumpstar is a wholly separate legal entity, functioning and operating under the sole direction of its principal and manager. Based on this, and the fact that TForce did nothing sufficient to create an employer-employee relationship with Jumpstar's drivers, Plaintiffs' assertion of joint employer status as to TForce fails. Consequently, TForce is entitled to judgment as a matter of law on all claims, as they rely solely on a joint employer supposition.

### FACTUAL BACKGROUND

Defendant is a same-day, last-mile transportation and logistics broker that primarily brokers deliveries to end-consumers. *See Declaration of Elijah Naylor ("Naylor Decl.") attached as* **Exhibit 1**, *at ¶ 3.* Based on business needs, TForce contracts with independent contractors to service specifically defined geographic territories to facilitate parcel pick-up and delivery at the local level. *Naylor Decl. at ¶ 4.* Other than their pick-up and delivery contracts, these authorized independent contractors (typically referred to as "Master Contractors") have no corporate affiliation whatsoever with TForce. *Declaration of Brian Tyson ("Tyson Decl."), attached as* **Exhibit 2**, *at ¶ 2.* During the period relevant to this action, co-defendant Jumpstar (a same day delivery company owned and operated by co-defendant Brian Tyson) provided delivery services as a Master Contractor for a number of TForce warehouse locations across multiple states, including TForce's facility in Houston, Texas. *Naylor Decl. at ¶ 7.* Those delivery services were performed by Jumpstar pursuant to an independent contractor agreement executed in May 2015 between Jumpstar and Dynamex Operations East, LLC (later known as TForce)[1]. *See Independent Contractor Agreement for Transportation Services ("Master Contractor Agreement"), attached as* **Exhibit 2**. The Master Contractor Agreement is

---

[1] Dynamex Operations East, LLC later changed its name to TF Final Mile, LLC, which subsequently changed its name to TForce Final Mile, LLC (in March 2017), which in turn changed its name to TForce Logistics East, LLC in

nonexclusive and Jumpstar is free to contract and conduct business with companies other than TForce:

> Concurrent Services: As an independent contractor/enterprise, the parties understand that Contractor offers its services equally to other companies (contract carrier) and/or to the public generally (common carrier), in a manner consistent with the other provisions of this Agreement. With the exception of exclusive use arrangements governed by the DOT Leasing Regulations and as may be agreed to by Contractor in its discretion, Contractor shall be free to perform concurrent delivery services for companies other than Dynamex, and to commingle cargo to the extent allowed by law.

*See Master Contractor Agreement, § 4(c); Naylor Decl. at ¶ 5.*

In order to meet their contractual obligations to TForce, these Master Contractors often contract with individual drivers, who are then assigned by Jumpstar to particular delivery routes formulated by TForce. *Naylor Decl. at ¶ 7; Tyson Decl. at ¶ 4.* Plaintiffs were engaged by Jumpstar as delivery couriers and their principal duties were the pick-up and delivery of parcels from TForce's warehouse to end-consumers. *Naylor Decl. at ¶ 7.* In performing those duties, Plaintiffs spent the overwhelming majority of their day in their delivery vehicles out on their delivery route. *Id.* The delivery vehicles used to perform their routes were owned by Jumpstar and/or Brian Tyson; TForce did not own any on those delivery vehicles. *Id.; Tyson Decl. at ¶ 7; Deposition Excerpts of Plaintiff Frederick Fuller ("Fuller Depo."), attached as* **Exhibit 4**, *at 11:19-25 and 12:8-9; Deposition Excerpts of Plaintiff Jarvis Sandifer ("Sandifer Depo."), attached as* **Exhibit 5**, *at 69:18-23; Deposition Excerpts of Plaintiff Thaddeus Edwards ("Edwards Depo."), attached as* **Exhibit 6**, *at 22:2-12.*

Jumpstar was exclusively and solely responsible for decisions regarding its courier drivers. For example, Jumpstar retained the decision-making authority regarding whether to engage a particular individual courier driver and TForce had no ability to hire or otherwise

---

December 2019. *Naylor Decl. at ¶ 6.* For purposes of this lawsuit, TForce is effectively Dynamex Operations East, LLC and there appears to be no dispute on that.

engage individual drivers on behalf of Jumpstar (nor has it ever done so). *Tyson Decl. at ¶ 5; Sandifer Depo. at 50:9-23*. Plaintiff Sandifer and Edwards both testified that they had no evidence that anyone at TForce was involved in their hiring at Jumpstar. *Sandifer Depo. at 49:23-25, 50:1; Edwards Depo. at 17:2-5, 37:18-21.* Moreover, TForce had no ability or authority to set or alter the rate of compensation for Jumpstar courier drivers—that authority rested exclusively with Jumpstar. *Naylor Decl. at ¶ 8; Tyson Decl. at ¶ 6.* Only Jumpstar could terminate its relationship with its courier drivers and Plaintiffs were never instructed or told that TForce had the ability to terminate their engagement with Jumpstar.[2] *Sandifer Depo. at 51:24-25, 52:1-2; Edwards Depo. at 37:11-17.*

With respect to courier drivers engaged by Jumpstar (including Plaintiffs), TForce never had any input into rates of pay, method of payment, nor frequency of pay; such decisions were in Jumpstar's exclusive control. *Naylor Decl. at ¶ 8; Tyson Decl. at ¶ 6; Sandifer Depo. at 60:11-14, 65:5-15; Edwards Depo. at 46:13-15.* Further, Jumpstar is responsible for—and does—process all of its payments to its courier drivers, including Plaintiffs. *Naylor Decl. at ¶ 8; Tyson Decl. at ¶ 6; Fuller Depo. at 8:2-8, 51:9-15; Sandifer Depo. at 67:8-18; Edwards Depo. at 48:15-25, 49:1-4.* This includes any deductions from the courier payments, which were made solely by Jumpstar. *Sandifer Depo. at 71:15-24.* TForce does not pay courier drivers engaged by a master contractor like Jumpstar, including the Plaintiffs. *Naylor Decl. at ¶ 8; Tyson Decl. at ¶ 6.* Plaintiffs expressly confirm that they never received any payments from TForce. *Fuller Depo at 111:11-18; Sandifer Depo. at 72:3-6; Edwards Depo. at 24:7-14, 47:3-13.*

---

[2] Even if a courier driver was removed from a particular route, the courier driver could still be assigned to other available routes, either for TForce or for any other companies with whom the Master Contractor may have contracted to perform delivery services. *Sandifer Depo. at 53:23-25, 54:1-2.* Thus, contrary to the anticipated assertion by Plaintiffs that TForce had the ability to "fire" them by removing their assigned route, removal from a particular route is ***not*** tantamount to a "termination."

TForce did not create, compile, or otherwise maintain employment records on courier drivers engaged by Jumpstar, including Plaintiffs. *Naylor Decl. at ¶ 9.* Plaintiffs could offer no evidence or knowledge of any such employment records at TForce. *Fuller Depo. at 83:5-7; Sandifer Depo. at 73:23-25, 74:1; Edwards Depo. at 50:13-16.*

On a typical day, each courier driver will first scan each product/item to be delivered on the route and that scanning is performed at the TForce warehouse. *Naylor Decl. at ¶ 10.* The sole purpose of scanning the products is to verify their provenance, as the scanning provides a chronology of custody and location of each item. *Id.; Sandifer Depo. at 21:10-23; Edwards Depo. at 32:4-18.* After all items are scanned, the courier drivers organize the order of deliveries on their route. While courier drivers may be provided with a specific end-consumer request (e.g., achieve delivery before a particular time of day), the courier drivers exercise their own discretion in organizing and planning their deliveries for the day. *Naylor Decl. at ¶ 10. Sandifer Depo at 42:18-24, 44:1-12; Edwards Depo. at 34:2-18.* As items are delivered, they are scanned by the courier driver, again, in order to track and confirm the actual delivery and verify custody and possession. *Naylor Decl. at ¶ 10.* If there are items remaining at the end of the day (for example, wrong address or no one is present at the end-consumer to accept delivery), those items are then returned and scanned back into inventory at the TForce warehouse at the end of the day—again, to ensure that there is a chronology of custody. *Id.*

When Plaintiffs were on their delivery routes, they were not personally monitored or supervised. *Fuller Depo. at 63:16-25, 64:1-25, 65:1-4, 76:22-25; Sandifer Depo. at 60:20-24; Edwards Depo. at 44:17-21.* They also interacted with the end-consumers on their delivery routes and those interactions were not supervised or evaluated. *Fuller Depo. at 77:1-6; Sandifer Depo. at 62:8-11; Edwards Depo. at 32:9-18, 44:24-25, 45:1-4.*

8

At TForce warehouses, there is typically an operation manager who is an employee of TForce. The operations manager is the key decision-maker on various aspects of the warehouse, including storage, inventory, and transportation logistics, including the communication with Master Contractors, and occasionally the Master Contractors' couriers regarding deliveries. *Naylor Decl. at ¶ 11.* With respect to the Houston warehouse where Plaintiffs were assigned by Jumpstar, the TForce operations manager was Ralph Duell. *Id.*

As part of those communications, it is not uncommon at all for the operations manager to communicate with the courier drivers numerous times throughout the day. For example, a courier driver may call in to the warehouse to indicate that a delivery cannot be made because there is no one present to accept delivery and ask how that delivery should proceed. *Naylor Decl. at ¶ 12.* The operations manager or another TForce employee who reports to the operations manager will then provide a solution based on the situation and possibly contact the end-consumer, which may involve re-attempting delivery later in the day or returning the items for that delivery to the warehouse to be re-scanned back into inventory. *Id.; Sandifer Depo. at 29:24-25, 30:1-12.* Also, if there are order/delivery changes, or route alterations necessary due to customer requests during the day, the operation manager may communicate those changes or customer requests directly to the courier driver by phone or text message. *Naylor Decl. at ¶ 12; Fuller Depo. at 66:8-19, 66:24-25, 67:1-3; Sandifer Depo. at 30:22-25, 31:1-6; Edwards Depo. at 34:11-18.* TForce would also communicate on a regular basis with Plaintiffs to ensure that the items being delivered were properly scanned to maintain the custody chronology. *Sandifer Depo. at 22:6-24.* Consequently, Ralph Duell (the Houston warehouse operations manager) or someone reporting to Mr. Duell routinely communicated with Plaintiffs on a typical day based on business or customer needs.

## ARGUMENT

### A. Summary Judgment Standard

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. FED.R.CIV. P. 56(c). Courts should grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Id.*; *Broussard v. Parish of Orleans,* 318 F.3d 644, 650 (5th Cir.2003) (internal citations omitted).

If the evidence presented to rebut the summary judgment is not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). In determining whether a genuine issue of material fact exists, the Court views the evidence and draws inferences in the light most favorable to the nonmoving party. *Id.* at 255; *Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998); *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995). However, the non-movant cannot avoid summary judgment by presenting only "conclusory allegations" or "unsubstantiated assertions," such as the bare allegations of a complaint, but must present sufficient evidence, such as sworn testimony in a deposition or affidavit, to create a genuine issue of material fact as to the claim asserted. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

### B. Plaintiffs Were Not Employed by Defendant

#### 1. The Applicable Standard in the Fifth Circuit (Economic Reality Test)

Under the FLSA, an employer is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The question of whether an individual or entity is subject to liability under the FLSA as the "employer" of

10

another is to be determined by the "economic reality" of the relationship. *See Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 33, 81 S.Ct. 933 (1961).

The Fifth Circuit utilizes the so-called "economic reality test" when determining a party's status as an employer under the FLSA. *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012). Under this test, courts evaluate "whether the alleged employer: (1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id*. at 355 (citation and internal quotation marks omitted). In joint employer contexts, each alleged employer must meet the economic reality test. *Id*. at 673 F.3d at 355; *Orozco v. Plackis*, 757 F. 3d 445, 448 (5th Cir. 2014).

The purpose of the FLSA—ensuring that workers are paid the wages that are lawfully owed to them—has been called humanitarian. However, recognition of this humanitarian purpose is not, and cannot be, the end of the analysis. *See Jacobson v. Comcast Corp.*, No. 1:09-cv-562, 2010 U.S. Dist. LEXIS 102834, *9 n. 3 (D. Md. Sept. 28, 2010). To effectuate its humanitarian ideal, the FLSA has been construed broadly; however, it must "***not [be construed] so broadly as to subsume typical independent contractor relationships.***" *Id*. at *12 (emphasis added). Indeed, construing the FLSA too broadly would have the effect of automatically conferring joint employer liability upon honest arms-length negotiated independent contractor or subcontractor relationships. While the development of joint employment under the FLSA was "intended to expose outsourcing relationships that lack a substantial economic purpose, [] it is manifestly *not* intended to bring normal strategically oriented contracting schemes within the ambit of the FLSA." *Id*. (emphasis added).

11

### 2. TForce is not a Joint Employer under the Economic Reality Test

#### a. Defendant Could Not Hire or Fire Plaintiffs

Based on the actual evidence (as opposed to unsubstantiated assertions), it is impossible for a jury to reasonably infer that TForce could have hired or did hire Plaintiffs. The uncontroverted testimony of Jumpstar's owner (Brian Tyson) is that he had singular authority to hire courier drivers at Jumpstar and that he has never delegated authority to anyone at TForce to make hiring or firing decisions with regard to Jumpstar courier drivers. *Tyson Decl. at ¶ 5*. Plaintiffs' opinions or subjective beliefs that they were "employed by TForce" does not make the underlying fact (whether TForce actually *could* or *did* hire them) any more or less likely. When TForce and Jumpstar *both* deny the authority of TForce to hire or fire Jumpstar drivers, that is dispositive and cannot be validly refuted by conclusory and baseless assertions that they were "hired by" or "employed by" TForce.

Similarly, TForce lacked any authority to fire Plaintiffs. While it is true that TForce could remove a courier driver from a particular route (in much the same manner that a homeowner can remove an individual painter from his house), that action would NOT terminate the courier driver's relationship with Jumpstar. *See, e.g., Sandifer Depo. at 53:23-25, 54:1-2*. A courier driver removed from a route was still available and eligible for other routes for TForce or, for that matter, *any other entity with whom Jumpstar contracted*. Plaintiffs are likely to conflate "being pulled from a route," with "being fired," but that simply is not true, nor is it supported by legally sufficient evidence. The only competent evidence on this element comes directly from Jumpstar and TForce, both of whom would actually have real knowledge of such authority and both of whom have testified that TForce had no authority to fire, and did not fire, Plaintiffs.

The Master Contractor Agreement confirms that Jumpstar had the sole discretion and responsibility to manage its own workforce to fulfill its contractual duties to TForce:

12

> Contractor shall furnish *at its own discretion, selection, and expense* any and all Personnel required, necessary or incidental to Contractor's performance of the Contracted Services. Contractor assumes *full and sole responsibility* for the payment of all amounts due to its Personnel for work performed in relation to this Agreement, including all wages, benefits and expenses, if any, and for all required state and federal income tax withholdings, unemployment insurance contributions, and social security taxes as to Contractor and all Personnel employed by Contractor in the performance of services under this agreement, and Contractor shall further be responsible for meeting and fulfilling the requirements of all regulations now or hereafter prescribed by legally constituted authority with respect thereto.

Master Contractor Agreement, § 6(b)(1) (emphasis added). While agreement provisions, by themselves, are not dispositive on the joint employer inquiry (in the sense that parties cannot contract around a joint employer finding), they *can* be probative evidence of whether any of the factors leans one way or the other. In the absence of any evidence to the contrary, the governing agreement between Jumpstar and TForce—coupled with the uncontroverted testimony of TForce and Jumpstar—clearly supports a finding that the hiring and firing decisions for rested solely with Jumpstar.

### b. Defendant Did Not Supervise or Control Plaintiffs' Schedules or Conditions of Employment

An entity does not become a joint employer "by engaging in the oversight necessary to ensure that a contractor's services meet contractual standards of quality and timeliness." *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 148 (4th Cir. 2017) (citing *Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2003)).

Other courts have determined that a joint employer relationship does not exist under facts nearly identical to those here. In *Layton v. DHL Express (USA), Inc.*, DHL contracted with a third party—Sky Land Express—to engage couriers to deliver packages for DHL out of its three Alabama locations, pursuant to a Cartage Agreement. 686 F.3d 1172, 1173 (11th Cir. 2012); *see also Likes v. DHL Express (USA), Inc.*, No. 2:08-cv-00428-AKK, 2012 U.S. Dist. LEXIS

13

188599, *24-25 (D. Al. Mar. 7, 2012). Sky Land hired individuals to serve as couriers and shuttle drivers. *Id*. The couriers reported to the DHL-owned warehouse every day to retrieve the DHL packages to deliver to DHL's customers. *Id*. Couriers could not begin their work until DHL informed them that the packages were coded for pick-up. *Id*. From there, the couriers, using a DHL-issued scanner, scanned and loaded the packages into their trucks. *Id*. As the couriers loaded their vehicles, DHL inspected their vehicles and uniforms, both of which bore DHL's logo, to ensure that they conformed with the Cartage Agreement's specifications. *Id*. at 1174. As couriers worked, they scanned the packages to record pick-up and delivery time. *Id*. When couriers completed their routes for the day, they returned to the DHL facility to unload any remaining packages. *Id*. At that time, the information from the scanner collected through the day was transmitted to DHL. *Id*. Throughout the day, DHL sent information regarding customer complaints, requests for redeliveries, and other non-routine matters directly to the couriers. *Id*.

The Eleventh Circuit Court of Appeals found that DHL was not a joint employer of the couriers. Instead, the Court found that DHL's control over the drivers was **not** the type contemplated by a joint employment relationship. *Id*. Rather, "DHL had certain objectives—having its packages delivered on time, serving its customers—that Sky Land, and therefore [the couriers], were tasked with accomplishing. DHL did not involve itself with the specifics of how those goals would be reached—it did not apportion tasks to individuals, specify how many individuals should be assigned to each delivery route, or structure the chain of command among [the couriers]." *Id*. at 1178. Furthermore, information collected from the scanners was considered "dissimilar from standard employer supervision," and therefore not indicative of control. *Id*. at 1179.

The court's analysis in *Layton* is on-point and instructive here. Plaintiffs were hired as courier drivers by Jumpstar to fulfill Jumpstar's obligations under the Master Contractor

Agreement. Plaintiffs couriers reported to the TForce-owned warehouse every day to retrieve the items to deliver to customers. Plaintiffs, using TForce-issued software, scanned and loaded the items into their trucks. As Plaintiffs worked, they scanned the packages to record pick-up and delivery time and the scanner information collected through the day was transmitted to TForce. When Plaintiffs completed their routes for the day, they returned to the TForce facility to unload any remaining packages. Throughout the day, TForce sent information regarding customer complaints, requests for redeliveries, and other non-routine matters directly to the couriers. Under these very facts, the court in *Layton* found an insufficient degree of supervision or control establish joint employer status by DHL. This court should find similarly with regard to TForce, because TForce did not direct, supervise, or control Plaintiffs' work.

### c. Defendant Did Not Determine Plaintiffs' Rate and Method of Payment

It is undisputed that Plaintiffs were paid by Jumpstar at all times and never received any payments or compensation from TForce. Plaintiffs offered no evidence at their depositions to even suggest, let alone prove, that TForce somehow determined the rate and method of payment that Jumpstar applied in compensating Plaintiffs for their work. To avoid any doubt on this factor, the uncontroverted testimony of Jumpstar's owner (Brian Tyson) is clear evidence that Jumpstar, alone, set the rate and method of payment for Plaintiffs (*Tyson Decl. at ¶* 5) and this is fully corroborated by the testimony of Elijah Naylor at TForce (*Naylor Decl. at ¶ 8*). Consequently, this factor militates against a finding that TForce is a joint employer.

### d. Defendant Did Not Maintain Plaintiffs' Employment Records

This factor is also easily resolved in favor of TForce. Plaintiffs testified that they are wholly unaware as to whether TForce maintained any employment records or files regarding them. *Fuller Depo. at 83:5-7; Sandifer Depo. at 73:23-25, 74:1; Edwards Depo. at 50:13-16.* And the uncontroverted testimony of TForce is that no such employment records were created or

maintained by TForce. *Naylor Decl. at ¶ 9*. With no evidence that anyone at TForce maintained employment records for Plaintiffs and clear testimony to the contrary, this factor overwhelmingly indicates a lack of joint employer status.

## CONCLUSION

For all the foregoing reasons, Defendant requests that the Court grant summary judgment in its favor and against Plaintiffs on all claims pursuant to Federal Rule of Civil Procedure 56.

Dated: October 9, 2020

Respectfully submitted,

*/s/* Kevin M. Duddlesten
Kevin M. Duddlesten
Texas Bar No. 00793644
kduddlesten@mcguirewoods.com
DUDDLESTEN LAW GROUP, PLLC
PMB 325
4347 W. Northwest Hwy, Ste 130
Dallas, Texas 75220
(214) 315-3520 (Telephone)

***Attorneys for Defendant***
***TForce Logistics East, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2020, a true and correct copy of the foregoing was served via the Court's ECF filing system, as follows:

John Cruickshank
Joshua Estes
716 S. Union Street
Richmond, Texas 77469
john@cruickshank.attorney
joshuaestes@estespc.net

*/s/* Kevin M. Duddlesten